981 So.2d 529 (2008)
G.M., a juvenile, Appellant,
v.
The STATE of Florida, Appellee.
Nos. 3D06-3032, 3D06-3033.
District Court of Appeal of Florida, Third District.
April 23, 2008.
Bennett H. Brummer, Public Defender, and Jessica Zagier, Assistant Public Defender, for appellant.
Bill McCollum, Attorney General, and Lunar Claire Alvey, Assistant Attorney General, for appellee.
Before GREEN, ROTHENBERG, and SALTER, JJ.
ROTHENBERG, Judge.
G.M. appeals the trial court's denial of his motion to suppress the evidence seized in this case. Because there is competent substantial evidence to support the trial court's factual findings, and the trial court correctly applied the law, we affirm.
The evidence presented at the hearing on G.M.'s motion to suppress is that Officers *530 Smith and Cuenca observed G.M. and a group of between six and eight individuals loitering in the park. G.M. alternated between sitting in a black Lexus parked next to another vehicle and standing outside the car talking to the others. The other individuals were also getting in and out of the vehicles. Because no one in the group was participating in park activities, and the police department had received reports of drug-related activity in the park, the officers decided to investigate.
The officers, who were in plain clothes and in an unmarked car, activated their emergency lights to identify themselves as police officers, crossed the street, pulled into the park behind the Lexus, and exited their vehicle. The motion to suppress reflects the following testimony by Officer Smith, which G.M. does not dispute:
Q. And when you approached the vehicles that the respondent was allegedly found in and that the other individuals were around, you put your sirens on, not your sirens, I'm sorry, your emergency equipment, is that correct?
A. Yes.
Q. And you also testified that you were wearing your badge when you exited your vehicle?
A. Yes
Q. Okay. Now the purpose of those sirens, I mean of that emergency equipment is not only to inform traffic of your motion or your situation, but it's to inform people that you're a police officer, isn't that right?
A. Correct.
Q. And you used it in this case, because you were, as you stated, a plain-clothes officer. You used that 
A. Used what?
Q. The equipment, the emergency equipment.
A. What kind of equipment?
Q. The equipment that you testified that you used.
A. The lights. I didn't use the siren.
Q. Okay, the equipment that you used, you used to identify yourself as a Police Officer and advise these individuals that you were a Police Officer and that although you weren't in Police clothes, you were in fact a Police Officer.
A. Yes.
Q. And that's the same reason you wear your badge out.
A. Right.
Officer Smith testified that he exited his vehicle, and as he approached the Lexus, he could smell marijuana emanating from the vehicle. He explained that in addition to the smell of marijuana, as he approached the Lexus he could see G.M. sitting in the back seat rolling a marijuana cigarette. While initially G.M. did not see Officer Smith because he had his head down, G.M. eventually looked up, saw Officer Smith with his badge, and put the marijuana in his mouth, which he later spit out.
Officer Cuenca testified that he also smelled the marijuana as he was approaching the Lexus, and that although he could see G.M. sitting in the back seat of the car, he did not know if G.M. saw them.
G.M. testified that he learned that the officers were approaching the car that he was in when someone alerted him to the presence of police officers. He was not alone in the car at the time. G.M. admitted that he had the marijuana in his lap, he was rolling a marijuana cigarette, and when he learned the police were outside, he put the marijuana cigarette in his mouth.
G.M. argues that, because the officers activated their emergency lights when they drove into the park and stopped their *531 vehicle behind the parked vehicle G.M. was sitting in, the officers automatically converted what would otherwise constitute a consensual police encounter into a stop. We disagree. Based upon the totality of the circumstances, a standard we are required to apply, G.M. was not stopped by law enforcement, and there was no Fourth Amendment seizure.

STANDARD OF REVIEW
The trial court's factual findings on a motion to suppress come to this Court cloaked with a presumption of correctness and must be sustained if supported by competent substantial evidence. San Martin v. State, 717 So.2d 462, 469 (Fla. 1998); Rhodes v. State, 638 So.2d 920, 926 (Fla.1994). However, when the trial court's ruling on a motion to suppress involves a mixed question of law and fact implicating constitutional questions, the ruling must be reviewed de novo. State v. Glatzmayer, 789 So.2d 297, 301 n. 7 (Fla. 2001); State v. Barmeier, 878 So.2d 411, 412 (Fla. 3d DCA 2004). Because G.M.'s argument, that he was "seized" when the officers activated their emergency lights, implicates G.M.'s Fourth Amendment protection against unreasonable seizures under both the Florida and the United States Constitutions, we must examine the evidence and all reasonable inferences in the light most favorable to sustaining the trial court's ruling, while performing a de novo review of the trial court's application of the law to the facts. Connor v. State, 803 So.2d 598, 605 (Fla.2001).
The State concedes, and we conclude, that when the officers activated the emergency lights of their unmarked vehicle and pulled into the park, they had no reasonable suspicion that G.M. or any of the individuals in or around the two vehicles parked in the park had committed or were committing a crime. It is equally clear that when the officers smelled marijuana coming from the black Lexus, the officers had reasonable suspicion to investigate, and when Officer Smith saw G.M. rolling a marijuana cigarette in the back seat of the Lexus as he and the other officer approached the vehicle, they had probable cause to arrest G.M. for possession of narcotics. The question we must resolve, therefore, is whether G.M. had been "seized" before reasonable suspicion and probable cause were established.
In resolving this question, we are bound by our state's constitution, which requires that we follow the United States Supreme Court's interpretation of the Fourth Amendment to the United States Constitution. Prior to 1982, Florida's courts "were free to provide its citizens with a higher standard of protection from governmental intrusion than that afforded by the federal constitution." State v. Lavazzoli, 434 So.2d 321, 323 (Fla.1983). However, in 1982, article I, section 12, of the Florida Constitution, relating to searches and seizures, was amended to link our exclusionary rule to the federal exclusionary rule and to require that we follow the United States Supreme Court's interpretations of the Fourth Amendment and to provide no greater protection than those interpretations. Bernie v. State, 524 So.2d 988, 990-91 (Fla.1988); see also Perez v. State, 620 So.2d 1256, 1258 (Fla.1993) (reaffirming the court's earlier position in Bernie, and recognizing that by reason of the 1982 amendment to article I, section 12 of the Florida Constitution, the Florida Supreme Court was bound by the United States Supreme Court's interpretation of the Fourth Amendment).
The United States Supreme Court has made it clear that law enforcement officers do not violate the Fourth Amendment's prohibition against unreasonable seizures merely by approaching individuals on the *532 street or in other public places, Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), identifying himself or herself as a law enforcement officer, United States v. Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), or by posing questions and asking for identification. United States v. Drayton, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); see also Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (stating that a seizure does not occur simply because a police officer approaches an individual and asks a few questions).
In Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court specifically held that "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." While recognizing that law enforcement officers may approach individuals in public places and briefly question them without reasonable suspicion and not violate the Fourth Amendment's prohibition against unreasonable seizures, G.M. asks this Court to adopt a per se rule that where a police officer in a vehicle activates his or her emergency lights, the officer automatically converts a police encounter into a seizure. The United States Supreme Court has, however, noted in Drayton and Bostick that such per se rules are inappropriate in the Fourth Amendment context and that "[t]he proper inquiry necessitates a consideration of `all the circumstances surrounding the encounter.'" Drayton, 536 U.S. at 201, 122 S.Ct. 2105 (quoting Bostick, 501 U.S. at 439, 111 S.Ct. 2382).
Some of the factors relevant to this inquiry include:
whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.
United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir.1991). Similarly, in United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir.2003), the court provided the following nonexhaustive list of factors:
[T]he threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.
To ignore these various factors and all of the surrounding circumstances, in favor of adopting a per se rule that the activating of flashing lights either in a marked or an unmarked police vehicle creates a Fourth Amendment seizure, would clearly violate federal law. In Bostick, the United States Supreme Court reviewed a decision by the Florida Supreme Court, adopting a per se rule that every police encounter on a bus constitutes a seizure under the Fourth Amendment. While the location of a police encounter is relevant, the United States Supreme Court held that it was error to adopt a per se rule based upon a single factor, and remanded the case for the Florida court to evaluate the seizure question under the correct legal standard, which requires a finding based upon the totality of the circumstances. Bostick, 501 U.S. at 437, 111 S.Ct. 2382.
*533 Based upon clear direction by the United States Supreme Court, requiring an analysis of all of the facts and circumstances in determining whether a seizure has occurred, we decline to adopt the per se rule argued by G.M., that the activation of emergency lights by law enforcement converts a police encounter into a seizure. We, therefore, review all of the facts and circumstances in the light most favorable to the State, to determine whether, prior to the officers smelling the marijuana and seeing G.M. in possession of a controlled substance, G.M. was seized in the Fourth Amendment context.

LEGAL ANALYSIS
The record reveals that the trial court applied the correct standard in ruling on G.M.'s motion to suppress the evidence by basing its determination on the totality of the circumstances. In denying the motion, the trial court found that based upon the totality of the circumstances, no seizure occurred until after the officers smelled the marijuana coming from the vehicle G.M. was seated in, establishing reasonable suspicion, and Officer Smith seeing G.M. in possession of marijuana, which provided the officers with probable cause to arrest G.M. We conclude that the trial court's findings are supported by the record and the law.
The undisputed facts are that the encounter involved only one unmarked vehicle and two plain-clothes officers. The officers activated their emergency lights before pulling into the park because they were in an unmarked vehicle and in plain clothes, and they wished to identify themselves as police officers. When the officers pulled into the park, a public place, and parked behind the Lexus G.M. was seated in, there were two vehicles parked together at that location with several individuals both standing near and seated in the vehicles. When the officers exited their vehicle, they did not brandish nor draw their weapons. Before directing their attention toward any of the individuals in or near these two vehicles, and before addressing any of the individuals individually or collectively, the officers smelled marijuana coming from the open window(s) of the Lexus G.M. was seated in, and Officer Smith saw G.M. rolling a marijuana cigarette, with marijuana on his lap. At no time did G.M. testify that he saw the emergency lights flashing from the undercover police vehicle, and, in fact, he testified that he was alerted to the presence of law enforcement officers when one of the other individuals told him they were there. It is undisputed, based upon the testimony of the officers and G.M., himself, that G.M. did not see the officers pull up behind the Lexus with their lights activated, and did not see the officers until he was alerted by someone to their presence and looked up and saw Officer Smith, who was already outside the Lexus.
At the hearing on the motion to suppress, G.M. offered the following testimony:
Q. How did you know the Officers were at the car?
[After objection by defense counsel was overruled and counsel for the State was asked to repeat the question, the question was somewhat rephrased].
Q. How did you know the Officers were outside the car?
A. Someone told me.
. . . .
Q. What did you do when the Officers approached?
A. I had Marijuana in my lap and I was rolling. I put it in my mouth.
G.M.'s testimony is consistent with that of the officers. Officer Smith testified that as he approached the Lexus, he smelled *534 marijuana emitting from the vehicle, and when he looked into the window, he saw G.M. rolling a marijuana cigarette with marijuana in his lap. Officer Smith testified that when he saw G.M. rolling the marijuana cigarette, G.M. had not seen him because his head was down, but when G.M. became aware of his presence, he put the marijuana in his mouth (and subsequently spit it out). Officer Cuenca testified that as he got out of his vehicle and was approaching the individuals standing near and sitting in the two parked vehicles, he smelled marijuana coming from the Lexus, but that he turned his attention to the other individuals in the vicinity when he saw Officer Smith approaching the Lexus.
We begin our analysis with the fact that there is no evidence in the record suggesting that G.M. saw the emergency lights of the officers' vehicle prior to the officers smelling the marijuana coming from the vehicle G.M. was seated in and Officer Smith seeing G.M. in possession of the marijuana. The record supports a finding that he did not. The lights the officers employed were not mounted on top of a marked police vehicle, but were, instead, mounted somewhere within the unmarked vehicle. It was daylight (approximately 5:00 p.m. in the middle of the summer on August 8). G.M. was seated in a vehicle with his back to the approaching officers, his head was down, and he was busy rolling a marijuana cigarette from the marijuana he had in his lap. G.M. admitted when he testified at the motion to suppress that he did not know the officers were there until they were outside the car and someone told him they were there. We, therefore, conclude that the record before us overwhelmingly supports a finding that the activation of the emergency lights in this case did not play any role in G.M.'s actions and should not play a role in a Fourth Amendment analysis of the facts and circumstances of this case.
The remaining facts and circumstances clearly do not constitute a seizure. The vehicles were parked in a public place. G.M. was seated in the back seat of one of the vehicles. The officers did not brandish their firearms or surround the vehicle G.M. was in. Although the officers identified themselves as police officers, they did not order any of the individuals to "halt," ask for identification, or question anyone until they smelled the marijuana coming from the Lexus and saw G.M. rolling a marijuana cigarette in plain view while they approached the parked vehicle he was in. Thus, under these facts and circumstances, no Fourth Amendment seizure occurred prior to the establishment of reasonable suspicion to investigate the smell of marijuana coming from the vehicle G.M. was seated in, and probable cause to arrest G.M. for possession of marijuana when Officer Smith approached the vehicle and saw him in possession of a controlled substance.
However, even if G.M. did see the emergency lights activated by the officers, we would find that this fact did not convert this police encounter into a Fourth Amendment seizure under federal law principles.
Recently, the Eleventh Circuit Court of Appeals found that the use of the officer's blue lights to identify himself as a police officer, because he arrived at a scene in an unmarked car, did not convert the encounter into a Fourth Amendment seizure. See United States v. Perez, 443 F.3d 772, 778 (11th Cir.2006). The facts in Perez are as follows. Lt. Gonzalez observed several men loading a boat onto a trailer at approximately 1:00 a.m. Lt. Gonzalez activated the flashing blue lights of his unmarked vehicle and illuminated the scene with the car's high-beam lights. Lt. Gonzalez, who was in uniform, approached the men, identified *535 himself as a police officer, asked for identification, asked who owned the boat, asked for the owner to provide registration for the boat, and asked why they were there so late at night. Perez invited Lt. Gonzalez to accompany him to retrieve the registration from the boat. When Perez opened a door leading to the cabin of the boat, Lt. Gonzalez saw four people inside, who he later learned, were Cuban nationals illegally entering the country. Perez filed a motion to suppress the evidence on Fourth Amendment grounds, the district court denied the motion, and Perez was convicted of smuggling aliens into the United States.
The district court found that Lt. Gonzalez's initial encounter with Perez and the others was consensual, despite the fact that he flashed his blue lights and was in uniform. The court reasoned that Lt. Gonzalez did not tell the men they were being detained, did not remove his weapon, or otherwise do anything to suggest they were being detained. Id. at 775-76. The Eleventh Circuit Court of Appeals affirmed the district court's denial of Perez's motion to suppress, concluding that the circumstances constituted a consensual encounter and that the use by Lt. Gonzalez of his blue lights to identify himself as a police officer did not convert the encounter into a Fourth Amendment seizure. Id. at 778. The court specifically held that in "viewing the totality of the circumstances, there was no `show of authority that communicate[d] to the individual that his liberty [was] restrained, meaning he [was] not free to leave.'" Id. (citing United States v. Baker, 290 F.3d 1276, 1278 (11th Cir. 2002)).
If the facts and circumstances in Perez did not constitute a seizure, then the facts and circumstances in the instant case do not constitute a seizure. In the instant case, the officers were not even in uniform, they did not have an opportunity to ask any questions, nor to ask the individuals to produce any identification. The evidence establishes that before asking any questions or addressing any of the individuals, the officers smelled marijuana and saw G.M. in possession of marijuana, thus establishing reasonable suspicion and then probable cause to arrest G.M. for possession of a controlled substance.
In United States v. Chrispin, 181 Fed. Appx. 935 (11th Cir.2006), the United States Circuit Court of Appeals found that although Officer Lorente activated the flashing lights on the roof of his marked patrol car when he pulled into a parking lot to speak to Chrispin, who he observed walking from an alleyway to the parking lot at 10:30 at night, the encounter between the Officer and Chrispin was not a seizure to which the Fourth Amendment applied. Id. at 939; see also State v. Hanson, 504 N.W.2d 219, 219-20 (Minn.1993) (reversing the appellate court's finding that whenever a police officer, with no reason to suspect criminal activity, drives up behind a parked vehicle and activates his or her flashing red lights, the encounter is converted into a Fourth Amendment seizure).
We agree with the trial court, that based upon the totality of the circumstances in the instant case, no seizure occurred prior to the establishment of reasonable suspicion and then probable cause to arrest G.M. There is no evidence that the officers blocked G.M.'s exit from the vehicle, and since G.M. was merely a passenger in the parked vehicle, his ability to drive away was not implicated. The officers did not order anyone to halt or order any of the occupants out of either vehicle. They did not question anyone, ask for identification, or unholster their weapons. They did not direct their attention toward anyone in particular or indicate in any way that the *536 individuals in the vicinity were not free to go. We, therefore, conclude that the activation of the officers' emergency lights to identify themselves as police officers did not convert the encounter into a seizure. In fact, the officers demonstrated good police sense by activating their emergency lights when approaching six to eight individuals in an unmarked vehicle, especially when the officers were not in uniform.
We note that this is a case of first impression in this district and that this Court's decision conflicts with prior decisions of other district courts of appeal in this state. To the extent that those decisions are based upon application of a per se rule holding that the use of emergency lights to identify officers as police officers when approaching an already stopped vehicle, constitutes a Fourth Amendment seizure, we certify direct conflict. See Armatage v. State, 954 So.2d 669 (Fla. 1st DCA 2007); Koppelman v. State, 876 So.2d 618 (Fla. 4th DCA 2004); Errickson v. State, 855 So.2d 700 (Fla. 4th DCA 2003); Young v. State, 803 So.2d 880 (Fla. 5th DCA 2002); Siplin v. State, 795 So.2d 1010 (Fla. 2d DCA 2001); Hrezo v. State, 780 So.2d 194 (Fla. 2d DCA 2001); Brooks v. State, 745 So.2d 1113 (Fla. 1st DCA 1999). In certifying direct conflict with the opinions listed above, we note that the per se rule employed in the above-listed opinions is in direct conflict with United States constitutional law holding that such per se rules are inappropriate in the Fourth Amendment context. See Drayton, 536 U.S. at 201, 122 S.Ct. 2105 (admonishing that for the most part, per se rules are inappropriate in the Fourth Amendment context); Bostick, 501 U.S. at 437, 111 S.Ct. 2382 (remanding for evaluation under the correct, totality of the circumstances, legal standard).
Affirmed; conflict certified.
SALTER, J., concurs.
GREEN, J. (dissenting).
When the police officers in this case parked their unmarked vehicle directly behind a lawfully parked car in a parking lot in which G.M. was seated and announced their arrival by activating their police emergency lights, G.M. was unlawfully seized for purposes of the Fourth Amendment because the officers had no reasonable suspicion that G.M. had committed any crime. By virtue of the show of police authority presented under this factual scenario, it is both patently unreasonable and potentially dangerous for any citizen to believe that he or she was immediately free to drive, run, or walk away from these police officers. For the reasons that follow, I believe that the trial court erred in its determination that this initial stop was consensual in nature. Therefore, G.M.'s motion to suppress should have been granted.

I.
To understand why the trial court erred in its denial of the motion to suppress, a full and objective recitation of all of the pertinent record evidence is first necessary.
Miami-Dade Police Officers Edward Smith and Elian Cuenca are undercover members of the crime suppression team, a protective squad unit that investigates street level narcotics activity. Prior to the incident at issue, the police had received several complaints about drug activity at the Kendall Lakes Park, a Miami-Dade County public park. As a result of these complaints on August 8, 2006, Officers Smith and Cuenca decided to patrol the park in an unmarked police vehicle. The officers were wearing plain clothes at the time.
At about five o'clock in the afternoon, which was still within normal park operating *537 hours, the officers' attention was drawn to a group of people; G.M. was in the group. The police officers saw these individuals talking and getting in and out of two cars parked alongside each other in two parking stalls; one car was a black Lexus. Although the officers had not received any complaints about G.M. or the other individuals, they decided to watch the group's activities from across the street.
For approximately fifteen minutes, the police officers basically observed G.M. get in and out of the black Lexus and walk over and talk to the others standing outside of the two parked cars in the parking lot. During this period of time, neither of the officers observed any drug activity or other criminal violations. Nevertheless, the two police officers decided to approach the individuals. The police testified that they approached the group because they were not engaged in what the officers considered "normal park activities."[1] Instead the officers characterized the group's behavior as "loitering." Thereafter, the officers drove their unmarked vehicle into the park, and parked it about three feet directly behind the parked Lexus in which G.M. was seated at the time. This car was effectively blocked from the rear.[2] The officers activated their flashing emergency police lights and simultaneously exited the vehicle. They were armed with undrawn handguns and they held up the badges on lanyards around their necks.[3]
After the officers exited their vehicle, Officer Smith testified that he observed six to eight individuals standing outside of the black Lexus and G.M. sitting in the back seat of the car. None of these individuals or G.M. attempted to flee the scene. As Officer Smith walked closer to the Lexus, he observed a window down and smelled *538 marijuana emitting from the car.[4] When Officer Smith looked into the window of the car, he observed G.M. rolling a marijuana cigarette on his lap. When the officer identified himself as a police officer, G.M. placed the marijuana cigarette inside his mouth and then spit it out. G.M. was arrested and placed into custody.
Officer Cuenca testified that after he and Officer Smith exited their vehicle and started to approach the black Lexus, he detected a strong odor of marijuana emitting from the vehicle.[5] Officer Cuenca, however, did not accompany Officer Smith up to the black Lexus. Rather, he testified that for officer safety reasons and to ensure that no one fled the scene, he stayed behind to watch the others standing around the car. In fact, Officer Cuenca essentially admitted that he was prepared to give chase and apprehend anyone who attempted to flee the scene during their investigation.[6] Finally, Officer Cuenca testified that although he could see G.M. inside of the car, he didn't know whether G.M. saw him or Officer Smith.[7]
G.M. testified that he had been sitting in the black Lexus for five to ten minutes rolling marijuana cigarettes on his lap. He stated that someone alerted him to the presence of the police officers outside the car.[8] As the officers approached the car, he stated that he placed the marijuana inside his mouth.
At the conclusion of this testimony, both the state and defense presented legal arguments to the trial court. The defense argued that the suppression motion should be granted because the police officers initially *539 lacked reasonable suspicion or probable cause to detain G.M. and his friends and that under the factual circumstances of this case the encounter was not consensual. The state argued that the encounter was purely consensual. The trial court agreed and denied the motion to suppress.
G.M. appeals and argues that the trial court erred in its determination that the police engaged in a consensual encounter under the facts and circumstances of this case. He argues that when, without reasonable suspicion or probable cause to believe that any criminal activity was afoot, the officers pulled up directly behind the parked car in which he was seated and flashed their emergency lights that he was unlawfully seized or detained at that precise moment for purposes of the Fourth Amendment. He further argues that the subsequent smell of the marijuana by the officers upon their exit from their vehicle cannot justify his initial unlawful detention or seizure.
Thus, the foremost issue to be resolved on this appeal is whether, under the specific facts and circumstances of this case, the police officer's initial approach to G.M. and the other individuals in the parking lot was consensual in nature or an unlawful show of police authority not founded upon reasonable suspicion or probable cause. Put another way, the question is whether any reasonable person in G.M.'s position would have believed that he or she was free to leave the scene upon the arrival of the two police officers. Prior to today's majority holding, this latter question would have resoundly and uniformly been answered in the negative by every other Florida District Court of Appeal in accordance with guidelines from United States and Florida Supreme Court precedent. Because I believe that all of our sister courts have correctly resolved this issue, I cannot join the majority's opinion to the contrary in this case.

II.
According to the Fourth Amendment, "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. For Fourth Amendment purposes, the Florida Supreme Court has explained that there are three levels of police-citizen encounters:
The first level is considered the consensual encounter and involves only minimal police contact. During a consensual encounter a citizen may either voluntarily comply with a police officer's requests or choose to ignore them. Because the citizen is free to leave during a consensual encounter constitutional safeguards are not invoked. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
The second level of police-citizen encounters involves an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. § 901.151, Fla. Stat. (1991). In order not to violate a citizen's Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop.
[T]he third level of police-citizen encounter involves an arrest which must be supported by probable cause that a crime has been or is being committed. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); § 901.15, Fla. Stat. (1991).
*540 Popple v. State, 626 So.2d 185, 186 (Fla. 1993) (emphasis added).
In this case, the trial court concluded that the police officer's initial encounter with G.M. and the others was consensual in nature because there was no evidence of a police detention.[9] As a matter of law, the trial court's conclusion was simply wrong.
In Popple, the Florida Supreme Court enunciated that there is no "litmus-paper test" for distinguishing a consensual encounter from a seizure. Popple, 626 So.2d at 187. Nevertheless, the court explained that a significant identifying characteristic of a consensual encounter is that the officer does not hinder or restrict the person's freedom to leave or freedom to refuse to answer inquiries, and the person may not be detained without a well-founded and articulable suspicion of criminal activity. Id. at 188.
This court has consistently held that a person is seized if, under the circumstances, a reasonable person would conclude that he or she is not free to end the encounter and depart. Id. (citing Jacobson v. State, 476 So.2d 1282 (Fla.1985)).
Following this pronouncement in Popple, and not pursuant to any application of a per se rule[10] as opined by the majority, Florida courts have (before today) uniformly and consistently held that "an officer's use of his or her emergency lights generally evidences an investigatory stop rather than a consensual encounter." Young v. State, 803 So.2d 880, 882 (Fla. 5th DCA 2002) (citing Siplin v. State, 795 So.2d 1010 (Fla. 2d DCA 2001); Hrezo v. State, 780 So.2d 194 (Fla. 2d DCA 2001); Brooks v. State, 745 So.2d 1113 (Fla. 1st DCA 1999)). The reason that these stops are deemed investigatory is "because the use of emergency lights reasonably leads a citizen to believe that he or she is no longer free to leave". Id. See Koppelman v. State, 876 So.2d 618 (Fla. 4th DCA 2004); Errickson v. State, 855 So.2d 700 (Fla. 4th DCA 2003). As the Second District in Hrezo astutely put it:
When a police officer turns on his or her emergency and takedown lights under these circumstances, a reasonable person would expect to be stopped, at a minimum, for a traffic infraction and perhaps for the crime of fleeing and eluding if he or she drove away. See § 316.126, Fla. Stat. (1999) . . .
780 So.2d at 196 (citation omitted). See Brooks, 745 So.2d at 1113-14 (observing that section 316.2397, Fla. Stat. (1997), allows only police vehicles to have blue flashing lights and section 316.126, Fla. Stat. (1997), requires all vehicles to pull to the closest edge of the roadway upon the approach of a vehicle displaying blue or red lights). For much of the same reasons, moreover, once a police officer positions a patrol car to obstruct the path of a stopped *541 vehicle, the encounter is elevated into an investigatory stop. Young, 803 So.2d at 882-83.
In this case, we had both such indicia of an investigatory stop. Once the two police officers pulled up directly behind the parked car in which G.M. was seated and blocked it from the rear, they announced their presence to the group by activating the flashing emergency police lights.[11] This then became, pure and simple, a nonconsensual investigatory stop. Young, 803 So.2d at 882. No reasonable person under such circumstances would feel free to leave. Indeed, even G.M. and/or his friends, who presumably may have been under the influence of marijuana at the time, nevertheless understood that they were not free to leave the scene. Moreover, one of the officers in this case candidly admitted that no one was free to leave during this investigation and that he was prepared to give chase to, and apprehend, anyone who attempted to flee the scene.
In support of its argument that the police encounter in this case was consensual, the majority opinion essentially relies on the holdings in United States v. Perez, 443 F.3d 772 (11th Cir.2006), and United States v. Chrispin, 181 Fed.Appx. 935 (11th Cir.2006). Their reliance upon these cases is misplaced because unlike this case, neither of the police/citizen encounters in those cases evidenced a show of police authority. These decisions therefore are factually dissimilar from the instant case.
In Perez, the defendant and co-defendant were charged and convicted of illegally smuggling Cuban nationals into the United States. The facts of this case were that at approximately 1:00 a.m., Lieutenant Arthur Gonzalez, a uniformed Miami-Dade police officer, was patrolling Matheson Hammock Marina in an unmarked police cruiser. He observed a boat docking with four men on it. He testified that given the "rough" weather, he found it unusual for a boat to be docking at this late hour. Lt. Gonzalez turned off the car engine and watched as the boat docked. He testified that the men on the boat had watched him as he drove by and they appeared to be "confused" and "awkward" in their handling of the boat. Lt. Gonzalez further testified that the "clean" and "neat" appearance of the men was inconsistent with fishing.
Lt. Gonzalez approached the men after they loaded the boat onto a trailer and as they were standing next to the truck. Lt. Gonzalez, who was alone and in uniform, did not draw his gun and significantly, did not block the truck's exit from the area with his patrol car. He briefly flashed his blue lights and left his car's high-beams on to illuminate the scene. He approached the men and inquired whether the men were "okay" and why they were in the area so late. Co-defendant Valdez responded that they had been fishing. When Lt. Gonzalez asked the men whether they had identification, they each produced a Florida driver's license. Lt. Gonzalez then asked who owned the truck and boat and Valdez responded that it was his and produced registration for the truck. Valdez told the officer that the boat's registration was on the boat and asked if Lt. Gonzalez wanted to see it. At this point, Perez volunteered to retrieve the registration from the boat and invited Lt. Gonzalez to come aboard with him.
After boarding the boat with the officer, Perez began to look for the registration documents but was unable to find them on the boat. Valdez informed Perez that the *542 documents were in the cabin. At that point, Perez began to speak in a loud voice and appeared "nervous" and "jittery" as he approached and opened the cabin's door. The officer then discovered four illegal Cuban nationals inside. The officer also learned that the other two men he observed assisting Perez and Valdez were also illegal aliens from Cuba.
Perez filed a motion to suppress on the grounds, among other things, that the initial encounter was not a valid Terry[12] stop because the officer did not have a reasonable suspicion of illegal activity. The district court denied the motion based upon its conclusion that the encounter was consensual in nature. On appeal, the Eleventh Circuit agreed. The court significantly found that although Lt. Gonzalez briefly flashed his blue lights to identify himself as a police officer in an unmarked car, at no point did the officer block Valdez's truck or otherwise obstruct Perez, Valdez, or others' exit from the area. More importantly, however, was the undisputed fact that Lt. Gonzalez neither asked to board the boat nor to see the interior of the cabin:
It also was undisputed that during the encounter Perez offered to get the registration from the boat, invited Lt. Gonzalez aboard the boat, and then proceeded voluntarily to open the cabin door, which led to the discovery of the Cuban nationals.
Perez, 443 F.3d at 778. Based upon the totality of these circumstances, the court correctly concluded that there was no "show of authority that communicate[d] to the individual that his liberty [was] restrained, meaning he [was] not free to leave." Id. (citation omitted).
It is readily obvious that Perez is significantly different from this case, with the exception of the fact that the officer in Perez and the officers in this case flashed their blue lights to identify themselves as police in unmarked vehicles. The officer in Perez did not use his vehicle to obstruct the defendant's vehicles. The officers in this case did. In Perez, there was only one police officer who initiated a dialogue with the defendants. There were two officers, one of whom proceeded to initiate a dialogue while the other admittedly stood guard to ensure, among other things, that no one left the scene. In Perez, the officer was in a lawful position to learn of the criminal activity through the expressed invitational gestures of the defendants. That did not occur in this case. In fact, the only way Perez could be similar to this case is if G.M. and/or his friends would have somehow summoned the two officers over to the cars as they smoked the marijuana. Perez, therefore, simply does not support the majority's holding that the encounter in this case was consensual in nature.
The Chrispin decision is likewise not factually analogous to this case. In Chrispin, Officer Lorente was patrolling in his marked police cruiser at approximately 10:30 p.m. when he observed Chrispin walking out of a dark alleyway into a poorly lit parking lot adjacent to several closed businesses. Officer Lorente was aware of the fact that there had been many "smash and grab" burglaries reported in the area where Chrispin was walking.
Officer Lorente pulled into the parking lot, stopped approximately fifteen to twenty feet from Chrispin, and activated the flashing lights on his police cruiser. The officer then exited his car and asked Chrispin "to please come over to him." Chrispin complied. As in Perez, the court found *543 that "[n]either the police car nor [the] officer blocked the defendant from leaving the area." Further, the officer never asked Chrispin for identification but did, politely and briefly, ask what Chrispin why he was in the area. Although Chrispin responded that he was coming from a nearby mall, the alleyway did not provide direct access to the mall because there were fences and other obstructions.
The officer noted that Chrispin became increasingly nervous during the questioning and placed his hands in his pockets several times. Officer Lorente asked Chrispin not to do this. The officer then asked Chrispin if he had any weapons or drugs and whether he could frisk Chrispin. Chrispin did not respond, rather he simply turned around and placed his hands on the officer's cruiser. The officer felt what he believed to be a pocket knife in Chrispin's pocket. Officer Lorente retrieved the item and discovered that it was a loaded handgun. The officer then arrested Chrispin.
Chrispin moved to suppress the evidence on the grounds that he had been seized without reasonable suspicion. The trial court denied the motion on the grounds that Chrispin's encounter was consensual. The court found that a reasonable person would have believed that he was free to leave during this police encounter and that a seizure did not take place. The court also concluded that Chrispin had consented to be frisked and even if he had not, the officer had articulable suspicion for the frisk based upon the fact that Chrispin was in a high crime area late in the evening, was seen emerging from a dark alleyway near closed businesses, and was nervous throughout the questioning.
The Eleventh Circuit affirmed the trial court's conclusion that the encounter was consensual and not a seizure. The court noted that the following factors were germane to its determination of whether a seizure has occurred:
Whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.
Chrispin, 181 Fed.Appx. at 938 (citing United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir.1991)). In this case, the court further noted that all of these enumerated factors weighed in favor of the trial court's conclusion that the encounter between Chrispin and the officer was not a seizure.
The same clearly cannot be said in the case before us. First of all, the car in which G.M. was seated was effectively blocked in from the rear by the officers' vehicle. G.M. was, as were others in the group, a minor. In this case, unlike Chrispin, or Perez, there were two police officers present, one of whom admittedly stood back and took a defensive stance to ensure that no one left or fled the scene during the course of their interaction with this group. Moreover, G.M. was in a public park during normal park hours and not in a high crime area after hours as was Chrispin. This case, therefore, is clearly factually distinguishable from Chrispin. All of these factors are critical indicia of the fact that this was an investigatory, and non-consensual, stop.

III.
Since this was indeed an investigatory Terry stop, the officers were required to have well-founded articulable suspicion that G.M. had committed, was committing, or was about to commit a crime. See § 901.151, Fla. Stat. (2007). The police officers in this case had no such well-founded, articulable suspicion that any *544 criminal activity was afoot when they initially approached G.M. and the group.
Although the officers testified that G.M. and the others were "loitering" in the park, the officers never testified to facts sufficient to show a reasonable suspicion for the crime of loitering. Under Florida law, G.M. and the others could only be guilty of the crime of loitering if (1) they were loitering or congregating in a) at a time, or in a manner not usual for law-abiding individuals; and (2) under circumstances that warranted a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity. § 856.021, Fla. Stat. (2007). G.M. and the others were observed by the police engaging only in totally innocuous activities (i.e., talking, and getting in and out of two lawfully parked cars in a parking lot of a public park during normal park hours). The officers did not observe any activities by G.M. or the others that might endanger the safety of other park patrons or property in the vicinity. Although G.M. and his friends were not engaging in traditional "park activities" such as playing basketball, they were not required to do so in order to insulate themselves from an unlawful police encounter. Thus, the Florida loitering statute cannot be utilized to supply the missing reasonable suspicion needed to justify the stop in this case. See Rinehart v. State, 778 So.2d 331, 335 (Fla. 2d DCA 2000) (Alternbernd, J., concurring) ("Loitering has long been an offense that occasionally tempts good police officers to exercise power in a manner that is inconsistent with the standards of our free society"); E.C. v. State, 724 So.2d 1243, 1245 (Fla. 4th DCA 1999) (loitering statute is not directed at mere idling); see T.L.F. v. State, 536 So.2d 371 (Fla. 2d DCA 1988)(no probable cause to arrest appellant for loitering and prowling where officers observed shirtless appellant conversing with two other individuals during business hours, where appellant made no attempt to flee, and where shirtless attire was not unusual or unlawful).

IV.
In conclusion, the stop in this case simply cannot be deemed consensual because of the show of authority utilized by the police officers in this case. Moreover, the police officers had no reasonable suspicion or probable cause to believe that G.M. was engaging in any criminal activity when they initially pulled up behind the vehicle in which he was found seated and activated their emergency lights. Contrary to the majority's holding, G.M. was therefore unlawfully detained at that point for Fourth Amendment purposes and his motion to suppress should have been granted. I do agree, however, with the majority that its holding is in direct conflict with Young v. State, 803 So.2d 880 (Fla. 5th DCA 2002); Hrezo v. State, 780 So.2d 194 (Fla. 2d DCA 2001); Siplin v. State, 795 So.2d 1010 (Fla. 2d DCA 2001); Brooks v. State, 745 So.2d 1113 (Fla. 1st DCA 1999); Koppelman v. State, 876 So.2d 618 (Fla. 4th DCA 2004); and Errickson v. State, 855 So.2d 700 (Fla. 4th DCA 2003), and, accordingly, conflict certification to the Florida Supreme Court is appropriate.
NOTES
[1] Officer Smith testified that:

Yes, we observed several juveniles or people, there were some adults, loitering in the park. They were next to a black Lexus, with also another vehicle next to it. We observed them for like 15 minutes. I observed the defendant in the black Lexus, which actually, he got out of the vehicle a couple of times, went over talking to the group of kids that were next to him. So they were all there together. We waited, like I said 15 minutes to see [sic] maybe they were going to play basketball, or what have you and nobody did anything to actually do that. And basically, we approached. Similarly, Officer Cuenca testified as follows:
Q. I'm saying, when you were across the street with Officer  with your partner in the vehicle, at that point have you seen anybody making drug transactions?
A. We didn't see the transaction, but there was another car there full of other juveniles and since he [G.M.] was coming in and out, there was other juveniles coming in and out of the cars, they looked very suspicious. They weren't playing basketball. There weren't doing anything that has to do with the park. So that's when we approached them.
[2] Officer Smith's testimony:

Q. You also testified that when you approached, you approached initially in your vehicle, not on foot. Correct?
A. Right, we drove up behind them. Officer Cuenca's testimony:
Q. Okay. Now when you approached the children, you did so in your unmarked police vehicle is that correct?
A. Correct.
Q. And you approached then; you pulled up behind their parked car?
A. Correct.
Although there was no direct testimony that the officers' vehicle blocked G.M.'s vehicle from the rear, this is the only reasonable and logical inference to be drawn from the officers' testimony. Since the record is silent as to whether this particular parking lot had the typical frontal concrete parking barriers, it is unknown whether this car was blocked in from the front as well.
[3] The record doesn't reflect whether the officers were wearing any other police insignia on their shirts or pants.
[4] Q. Okay. and so as you're approaching the respondent or this group of people, what do you observe?

A. I just observed them, a few of them were out of the car, there was like between six and eight of them. I don't know the exact amount, and that's when I observed, when I got closer to the vehicle, I observed the window down of the vehicle and marijuana emitting from the vehicle.
[5] Q. Okay, Now you have stated earlier in your testimony that after you exited the vehicle and you approached that once you got closed, you smelled the odor of marijuana.

A. Yes.
Q. Suspect marijuana?
A. Yes.
[6] Q. Now, when you exited the vehicle, did you announce to them that you were police officers, even though you have your badge on?

A. I don't know if my partner did. I didn't.
Q. You did not. Okay. Did anyone try and run away when you approached?
A. No.
Q. Were you concerned that someone might try and run away?
A. Yes.
. . . .
Q. And when you approached, although you had not observed an actual crime being committed, you approached to investigate the situation. If someone upon your approach had taken off you would have attempted to apprehend them to continue the investigation is that correct?
A. Correct.
. . . .
Q. And when you approached, although you had not observed an actual crime being committed, you approached to investigate the situation. If someone upon your approach had taken off, you would have attempted to apprehend them to continue the investigation, is that correct?
A. Correct.
[7] Q. And did the defendant see you?

A. I'm not sure if he saw us. I'm not sure if he saw me.
[8] Q. How did you know the Officers were outside the car?

A. Someone told me.
Q. Was there someone in the car?
A. Yes.
Q. What did you do when the officers approached the car?
. . . .
A. I had marijuana in my lap and I was rolling. I put it in my mouth.
[9] According to the trial court:

There was no evidence counsel, no evidence that these folks were detained in this classic sense of a detention. Circumstances weren't there. The police weren't there in (unintelligible). They didn't pull out their guns. They hadn't surrounded anybody. As a matter of fact, the Respondent in this case was sitting in a car. Never even opened the door, according to the testimony. So, you know, he was there. He wasn't going anywhere anyway because he was sitting in the car. Based on the totality of these circumstances, the Court is going to deny the motion to suppress. Denied.
[10] See, e.g., Hrezo v. State, 780 So.2d 194, 195 (Fla. 2d DCA 2001)(taking care to note that it was not deciding whether a consensual encounter occurred when an officer turned emergency lights on for a second or two at night to signal to a citizen that the approaching person is a police officer rather than a robber).
[11] G.M. testified that he was made aware of the presence of the police by another passenger in the car. The officers did not (and indeed could not) dispute such testimony.
[12] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).