[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-12404
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 21, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-20589-CR-CMA

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MIGUEL PEREZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 21, 2006)**

Before TJOFLAT, BIRCH and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Miguel Perez appeals his conviction, entered after a two-day bench trial, for multiple counts of bringing aliens to the United States knowing, or in reckless disregard of the fact that the aliens had not received prior authorization to enter the

country, in violation of 8 U.S.C. § 1324(a)(2)(B)(iii).  The charges arose from law enforcement's discovery of six Cuban nationals on a boat from which Perez, along with a co-defendant, the owner of the boat, had disembarked at Matheson Hammock in southwestern Miami-Dade County.  On appeal, Perez argues the district court erred by: (1) denying his motion to suppress evidence seized from the boat; (2) admitting evidence of his 2002 conviction for smuggling aliens, pursuant to Fed. R. Evid. 404(b); and (3) denying his motion for judgment of acquittal, pursuant to Fed. R. Crim. P. 29, in which he argued the government failed to show that he knowingly committed the offense or acted with reckless disregard of his passengers' status as illegal aliens.  After thorough review, we affirm.

## I.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact."  United States v. Zapata, 180 F.3d 1237, 1240 (11th Cir. 1999). We accept the district court's factual findings as true unless the findings are shown to be clearly erroneous.  Id. at 1240-41.  All facts are construed in the light most favorable to the prevailing party below.  United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000).  The district court's application of the law to the facts is reviewed de novo.  Id.  We review for abuse of discretion a district court's ruling on the admissibility of evidence of uncharged conduct under Rule 404(b).  See

2

United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc). We review de novo the district court's denial of a motion for judgment of acquittal, viewing the facts and drawing all inferences in the light most favorable to the government. See United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002), cert. denied, 537 U.S. 1132 (2003). To affirm the denial of a motion for judgment of acquittal, filed pursuant to Fed. R. Crim. P. 29, we need determine only that a reasonable factfinder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt. Id.

The relevant facts are straightforward. On August 6, 2004, Perez and his co-defendant, Juan Carlos Valdez, were indicted for one count of conspiring to bring aliens into the United States illegally, in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(iii) (Count 1), and six counts of bringing aliens into the United States illegally, in violation of 8 U.S.C. § 1324(a)(2)(B)(iii) and 18 U.S.C. § 2 (Counts 2-7). Before trial, Perez filed a motion to suppress evidence discovered by the government at the time of his arrest. In his motion, Perez stated that, on July 25, 2004, law enforcement agents from the Miami-Dade County Police Department ("MDPD") and the U.S. Border Patrol boarded a boat at the Matheson Hammock Marina, without consent or a warrant, and discovered six illegal aliens whose entry into the United States formed the basis of the charges against him. Perez argued

3

that: (1) the stop was not a valid border search since there was no evidence the boat had crossed an international boundary; and (2) the encounter was not a valid Terry[1] stop because the law enforcement officers did not have reasonable suspicion of illegal activity. Also before trial, the government filed notice of its intent to introduce evidence of Perez's prior conviction for alien smuggling, pursuant to Fed. R. Evid. 404(b).

At the suppression hearing, MDPD Lieutenant Arthur Gonzalez testified that on the evening of July 25, 2004, while performing an off-duty residential patrol in southwest Miami-Dade County, he entered Matheson Hammock Marina and observed a boat docking with four men on it. This observation took place at about 1:00 A.M. and Lt. Gonzalez testified that, given the "rough" weather, he found it unusual for a boat to be docking that late in the evening. Lt. Gonzalez turned off the engine of his unmarked police cruiser and watched as the 28-foot Roberts fishing boat entered its dock location. Lt. Gonzalez said that the men on the boat watched him as he drove by and that they appeared to be "confused" and "awkward" in their handling of the boat. He also observed no indication that the men had been fishing, but rather, that they looked "very clean" and "neat," which, to Lt. Gonzalez, was not consistent with fishing.

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

After the men had loaded the boat onto a trailer, Lt. Gonzalez approached them as they were standing next to the truck. He was alone and in uniform, did not draw his gun, and did not block the truck's exit from the area with his patrol car. After he briefly flashed his blue lights, he left his patrol car's high-beams on in order to illuminate the scene. He approached the men and asked: "You guys okay? What are you doing here so late?" to which Valdez responded that they had been fishing. When Lt. Gonzalez asked the men if they had identification, each produced a Florida driver's license. Lt. Gonzalez then asked who owned the truck and boat, and Valdez responded that they were his and produced registration for the truck. Valdez said that the boat registration was on the boat and asked if Lt. Gonzalez wanted to see it. At that point, Perez volunteered to retrieve the registration from the boat and asked if Lt. Gonzalez wanted to come with him.

After boarding the boat, Perez began looking for the registration documents. Unable to find them, he asked for Valdez's help, who, in turn informed Perez that the papers were in the cabin. Perez then began speaking in a loud voice as he approached the boat's cabin and appeared "nervous" and "jittery" when he opened the cabin door. Lt. Gonzalez found four people inside who, he later learned, were Cuban nationals illegally entering the country from Cuba. The two other men, who Lt. Gonzalez had observed helping Perez and Valdez load the boat, were also

5

illegal aliens from Cuba. At the time he discovered the Cuban nationals, Lt. Gonzalez estimated that about five or six minutes had passed since the time he initially approached the men. At no point had Perez or any other person asked to leave and Lt. Gonzalez never told the men that they were not free to leave.

The district court denied Perez's motion to suppress, finding that Lt. Gonzalez's initial encounter with Perez and the others was consensual, despite the fact that he flashed his blue lights and was in uniform. The court reasoned that Lt. Gonzalez did not tell the men that they were being detained and did not remove his weapon or "perform any acts that would indicate the Defendants were detained." Thus, the court found that the encounter was consensual and there was no Fourth Amendment violation.

After denial of his suppression motion, Perez filed a pre-trial motion to "strike" the government's introduction at trial of his 2002 conviction for alien smuggling as Fed. R. Evid. 404(b) evidence. Perez argued that there was no similarity between the extrinsic act and the current offense and therefore, the evidence did not tend to show it was more probable that he engaged in alien smuggling in the instant case. He also urged that the evidence was not offered for a legitimate evidentiary purpose, but rather to show simply that he had a propensity to commit this sort of crime. Finally, he claimed that any probative value

6

attributable to the fact of the prior conviction was undercut by the "long temporal gap between the extrinsic and charged offenses" and was outweighed by the danger of unfair prejudice. The district court did not rule on the motion before the start of trial.

At the subsequent bench trial, Lt. Gonzalez testified consistently with his testimony at the suppression hearing. The government also presented the testimony of Yamisleidy Estevez-Galindo, one of the Cuban nationals discovered on Perez's boat, hidden inside the cabin. In July 2004, she and her uncle, who was also a Cuban national, flew from Cuba to the Bahamas, where they stayed for two days before learning that a boat was coming in from, and returning to, the United States. Estevez-Galindo discovered that she and her uncle might be able to gain passage on the boat to the United States if they went and stood on a certain beach, waited for the boat, and obtained permission from the captain when the boat arrived. Estevez-Galindo went to the designated beach on the day the boat was supposed to arrive. After the boat failed to come on that day, Estevez-Galindo and her uncle spent the night on the beach and continued to wait. The boat appeared the next day and Estevez-Galindo secured two places on it for her and her uncle. She had with her her mother's Florida driver's license, which she had obtained in Cuba.

About three hours after leaving the Bahamas, the boat began to experience engine problems and Estevez-Galindo and the other passengers signaled to passing boats until the boat piloted by Perez and Valdez stopped. The Cuban nationals told Perez and Valdez that they were from Miami and that they had been fishing. Estevez-Galindo testified that the captain of the boat from the Bahamas had instructed her that if questioned, she should say that she had been fishing. When Perez or Valdez asked the aliens where they wanted to go, the aliens responded that they wanted to get to shore -- just "to leave [them] on land." In response to questions from Perez and Valdez, Estevez-Galindo became very nervous and began to cry. Although Perez or Valdez asked some of the other passengers if they had identification, they did not ask Estevez-Galindo for her identification. Estevez-Galindo estimated she was on the boat captained by Perez and Valdez for less than two hours before they arrived in the United States.

Special Agent Pablo Milian of the United States Immigration and Customs Enforcement testified that, in 2002, he participated in an earlier investigation involving Perez. Special Agent Milian stated that, when he interviewed Perez in 2002, Perez claimed that he had been on a rescue mission, bringing fuel to a stranded boat that had onboard a number of Cuban nationals, en route to the United States. Perez and three co-defendants were subsequently charged in a multi-count

8

indictment with conspiracy and attempted alien smuggling, in violation of 8 U.S.C. § 1324(a)(2)(A). Perez pled guilty to one count of alien smuggling. Over Perez's objection, the government introduced a certified copy of Perez's 2002 conviction during the testimony of Special Agent John Ramos of the U.S. Border Patrol. Special Agent Ramos also testified that Matheson Hammock was not a designated port of entry into the country.

At the close of the government's case, Perez moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(a), which the district court denied. The defense then rested without presenting any evidence and renewed its Rule 29 motion. The district court, sitting as trier of fact, found Perez not guilty of Count 1, conspiracy to smuggle aliens, and guilty of Counts 2 through 7, specifically finding that he acted with reckless disregard of the fact that the passengers were aliens who were not authorized to enter the United States. The trial court, however, acquitted co-defendant Valdez on all counts, observing that the circumstantial evidence, as it related to Valdez, was insufficient to establish that he acted in reckless disregard of the passengers' status. The court noted that Perez's prior conviction put him on notice that "it's not enough simply to take somebody aboard and bring them over here, and the failure to do more, the failure to inquire further . . . does lead me to conclude that he did act in reckless disregard."

9

Perez moved for a judgment of acquittal, arguing that there was insufficient evidence to support the finding that he acted with reckless disregard. The district court denied the motion without further comment and sentenced Perez to a 60-month term of imprisonment. This appeal followed.

## II.

First, Perez argues the district court erred by denying his motion to suppress. There are three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests. United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989). The district court found that the instant case involved the first type, a consensual encounter. We have explained that

> the first category of consensual encounters does not implicate [F]ourth [A]mendment scrutiny. The second category involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave. In order to justify such a [F]ourth [A]mendment "seizure," the government must show a reasonable, articulable suspicion that the person has committed or is about to commit a crime. Finally, when the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required.

United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986) (internal citations omitted).

10

The Supreme Court has held:

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage–provided they do not induce cooperation by coercive means. <u>If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.</u>

United States v. Drayton, 536 U.S. 194, 200-01 (2002) (emphasis added and internal citations omitted). Indeed, "[t]he mere fact that a law enforcement officer approaches an individual and so identifies himself, without more, does not result in a seizure. See Baker, 290 F.3d at 1278 (citing Florida v. Royer, 460 U.S. 491, 497 (1983)). Moreover, under controlling case law, the simple act of police questioning does not constitute a seizure. See Florida v. Bostick, 501 U.S. 429, 434 (1991). Factors relevant to this inquiry include, among other things: "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police." United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991). A seizure occurs for Fourth Amendment purposes, however, "'only when, by means of physical

11

force or a show of authority, [a person's] freedom of movement is restrained.'" Craig v. Singletary, 127 F.3d 1030, 1041 (11th Cir. 1997) (quoting United States v. Mendenhall, 446 U.S. 544, 555 (1980)).

Here, we readily conclude the circumstances indicate only a consensual encounter and, accordingly, did not result in a Fourth Amendment violation. Lt. Gonzalez's uncontroverted testimony showed that he approached Perez's group and asked if they were okay, given the rough weather and late hour of the encounter. When he inquired whether they had identification, but did not specifically ask to see it, all of the men "automatically produced" Florida driver's licenses. He spoke with them in a "conversational" tone and, although he was in uniform, his firearm remained holstered.[2] Lt. Gonzalez briefly flashed his blue lights, but only to identify himself as a police officer because he arrived at the scene in an unmarked car. Notably, at no point did Lt. Gonzalez block Valdez's truck or otherwise obstruct Perez, Valdez, or the others' exit from the area. It also was undisputed that during the encounter Perez offered to get the registration from the boat, invited Lt. Gonzalez aboard the boat, and then proceeded voluntarily to

_____

[2]We accord "little weight" to the unremarkable fact that Lt. Gonzalez was in uniform and had a holstered firearm. Cf. Drayton, 536 U.S. at 204-05 (holding that officers' display of their badges, as well as the presence or lack of a uniform, and holstered firearm all should "have little weight in the analysis," as the public knows that most officers are armed and many are required to wear uniforms).

12

open the cabin door, which led to the discovery of the Cuban nationals. Lt. Gonzalez asked neither to board the boat nor to see the interior of the cabin.

On this record, viewing the totality of the circumstances, there was no "show of authority that communicate[d] to the individual that his liberty [was] restrained, meaning he [was] not free to leave." United States v. Baker, 290 F.3d 1276, 1278 (11th Cir. 2002). There was no Fourth Amendment "seizure" because a reasonable person would have felt free to leave. Accordingly, the district court did not err by denying Perez's motion to suppress evidence discovered in the course of this "consensual encounter."

Next, Perez claims that the district court impermissibly relied on the evidence of his 2002 conviction for alien smuggling, pursuant to Federal Rule of Evidence 404(b),[3] to find that he had committed the instant offense in a knowing fashion or with reckless disregard of the Cuban nationals' illegal immigration

---

[3]This rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, . . . of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

13

status. He contends that the prior conviction served only to show his criminal propensity. We disagree.

Rule 404(b) permits the admission of prior-bad-acts evidence to show motive, preparation, knowledge, and intent, as well as an ongoing scheme or plan. See United States v. Lehder-Rivas, 955 F.2d 1510, 1515-16 (11th Cir. 1992); United States v. Cross, 928 F.2d 1030, 1047-48 (11th Cir. 1991). In reviewing 404(b) decisions, we apply a three-part test for admissibility of such evidence: (1) the evidence must be relevant to an issue other than the defendant's character; (2) there must be sufficient proof so that the factfinder could find that the defendant committed the extrinsic act; and (3) the evidence must possess probative value that is not substantially outweighed by undue prejudice. See United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003).

The evidence of Perez's prior alien-smuggling conviction was relevant to establish his state of mind with respect to the conspiracy offense, as well as to the six substantive alien-smuggling counts. "One of the elements of conspiracy that the prosecution must establish beyond a reasonable doubt is an intention to further the purposes of the conspiracy." United States v. Costa, 947 F.2d 919, 925 (11th Cir. 1991). When a defendant charged with conspiracy enters a plea of not guilty, as in this case, he makes intent a material issue in the case. See id.; United States

v. Delgado, 56 F.3d 1357, 1365 (11th Cir. 1995). Perez did not "affirmatively take the issue of intent out of contention by stipulating that [he] possessed the requisite intent." Costa, 947 F.2d at 925; see also United States v. Matthews, 431 F.3d 1296, 1311 (11th Cir. 2005) ("Evidence of such extrinsic evidence as may be probative of a defendant's state of mind is admissible unless [the defendant] affirmatively takes the issue of intent out of the case." (internal quotations omitted) (alteration in original)). In fact, by his theory of defense -- that he did not know the aliens' illegal status -- he expressly made his knowledge and intent a focal point of the case, plainly making the evidence of his prior conviction admissible for non-propensity purposes.[4] Moreover, the prior conviction was relevant to Perez's claim that the government did not carry its burden of establishing that he brought the aliens to the United States "knowing or in reckless disregard of the fact that [the aliens] ha[d] not received prior official authorization to come to, enter, or reside in the United States." See 8 U.S.C. § 1242(a)(2). Accordingly, the first prong of Jernigan is satisfied here.

---

[4]Perez has consistently and repeatedly argued, both in this Court and at trial, that he did not know about the aliens' illegal status. Thus, the instant case does not involve "a mere plea of not guilty," which, in any event, under our controlling precedent is enough to satisfy the second prong of the 404(b) test. Cf. Matthews, 431 F.3d at 1314-15 (Tjoflat, J., concurring) (discussing first prong of Circuit's three-part test for admissibility of prior-crime evidence under 404(b) and admissibility of such evidence based solely on plea of not guilty in conspiracy case).

15

The fact of the prior conviction fully satisfied the second prong of Jernigan. See Delgado, 56 F.3d at 1365 (finding second prong of the Rule 404(b) analysis satisfied where "[t]he extrinsic act introduced against [the defendant] involves a conviction"). Finally, we are satisfied the district court did not abuse its discretion when it determined the probative value of Perez's prior conviction, which involved another alien-smuggling offense and took place less than two years before the instant offense, outweighed its prejudicial effect. Cf. United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005) (highlighting the "highly probative nature" of 404(b) evidence to establish defendant's intent where there exists "[a] similarity between the other act and a charged offense"). This determination lies within the discretion of the district court and "calls for a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." Jernigan, 341 F.3d at 1282 (internal quotation marks and citation omitted). In short, the district court did not abuse its discretion in admitting the prior conviction as 404(b) evidence.

Finally, Perez argues the evidence was insufficient to support his conviction under 8 U.S.C. § 1324(a)(2)(B)(iii).[5] As part of its case, the government must

_____

[5] The statute provides the following, inter alia:

16

prove the defendant conducted himself "knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States." 8 U.S.C. § 1324(a)(2)(B)(iii). On appeal, Perez contends that the government's evidence was deficient and showed, not that he acted with deliberate indifference to his passengers' status, but rather that he acted with "due diligence and caution" after the Cubans presented him with Florida

---

**§ 1324. Bringing in and harboring certain aliens**
(a) Criminal penalties

. . . .

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs--

. . . .

(B) in the case of--

. . . .

(iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under Title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

18 U.S.C. § 1324.

17

drivers' licenses and he questioned them about where they were from, to which they replied Miami.

Again, in reviewing a district court's denial of a motion for judgment of acquittal, we must view the facts, and draw all reasonable inferences therefrom, in the light most favorable to the government. See United States v. Hansen, 262 F.3d 1217, 1236 (11th Cir. 2001). Our Pattern Jury Instructions are instructive to the instant analysis and provide the following definition in cases involving violations of 8 U.S.C. § 1324(a)(1)(A)(ii), proscribing unlawfully transporting illegal aliens:

> To act with "reckless disregard" means to be aware of, but consciously and carelessly ignore, facts and circumstances clearly indicating that the person transported was an alien who had entered or remained in the United States in violation of law.

Eleventh Circuit Pattern Jury Instructions (Criminal) at 83.2 (2003) (emphasis added); see also id. at 83.3 (utilizing same definition of "reckless disregard" for violation of 8 U.S.C. § 1324(a)(1)(A)(iii)).

Moreover, we have approved the following definition of the "reckless disregard" element of transporting illegal aliens, in violation of § 1324(a)(1)(A)(ii):

> The phrase "reckless disregard of the fact," as it has been used from time to time in these instructions, means deliberate indifference to facts which, if considered and weighed in a reasonable manner, indicate the highest probability that the alleged aliens were in fact aliens and were in the United States unlawfully.

18

United States v. Zlatogur, 271 F.3d 1025, 1029 (11th Cir. 2001) (quoting United States v. Uresti-Hernandez, 968 F.2d 1042, 1046 (10th Cir. 1992)). We find our interpretations of the same "reckless disregard" terminology in §§ 1324(a)(1)(A)(ii) and (iii) -- both in our Pattern Jury Instructions and in Zlatogur -- instructive to our instant analysis of § 1324(a)(2)(B)(iii). Indeed, it is a well-established canon of statutory interpretation that identical words used in the same statute are intended to have the same meaning. United States v. DBB, Inc., 180 F.3d 1279, 1285 (11th Cir. 1999). Accordingly, we interpret subsection 1324(a)(2)(B)(iii)'s "reckless disregard" terminology by reference to our interpretation of the same words in subsection 1324(a)(1)(A)(ii) and (iii).

Here, the government presented ample evidence of "facts and circumstances" from which a reasonable trier of fact could conclude beyond a reasonable doubt that Perez acted knowingly or with reckless disregard of the fact that his passengers were inadmissible aliens. Perez and Valdez allowed Estevez-Galindo and the others to board their boat. While some of the aliens presented identification to Perez and Valdez, Estevez-Galindo was not asked to do so and, when asked where in Miami they wanted to go, the passengers simply indicated they wanted to reach "land."[6] Perez apparently made no effort to assist the captain

_____

[6]In its response to Perez's motion for a judgment of acquittal, the government argued that "Estevez-Galindo's testimony that the Cuban aliens told the defendants to take them 'anywhere, for

19

of the first boat after the boat broke down or to report that it was still stranded, although the captain of that boat stayed on the allegedly malfunctioning craft after the others were transferred to Perez's boat late at night.

Afterwards, at Matheson Hammock, during his late night encounter with Lt. Gonzalez, Perez acted nervously and failed to reveal that there was anyone in the cabin of the 28-foot fishing boat before Lt. Gonzalez discovered them. Nor was there the slightest indication anyone on the boat had been fishing. Finally, in 2002, Perez was convicted of alien smuggling, an offense that also required that he act knowingly or with reckless disregard of the status of aliens. In distinguishing Valdez's conduct from Perez's conduct, the district court found:

> Mr. Perez is in a different position from Mr. Valdez because of his prior conviction and because at that point, upon his conviction and upon his plea in a very similar case, he was put on notice that it's not enough simply to take somebody aboard and bring them over here, and the failure to do more, the failure to inquire further, other than to look at some driver's licenses[,] in his position and under these facts does lead me to conclude that he did act in reckless disregard . . . .

On this record, the district court, sitting as the finder of fact, reached a reasonable conclusion. We are satisfied that a reasonable factfinder could find, beyond any reasonable doubt, that Perez knew that his passengers were inadmissible aliens or

them only to leave us on land,' [was] a clear reference to this country's wet foot/dry foot immigration policies with respect to Cuban aliens." Government's Response to Defendant's Motion for Judgment of Acquittal at 12.

20

recklessly ignored facts and circumstances indicating that they were. Accordingly, the district court did not err by denying the motion for judgment of acquittal.

We are unpersuaded by Perez's other challenge to the sufficiency of the evidence. Perez suggests that he was entitled to a judgment of acquittal because Lt. Gonzalez did not provide him with an "immediate opportunity" to present the illegal aliens to an immigration official. His argument is premised on a faulty reading of the statutory language, which contains no requirement that law enforcement provide an "immediate opportunity" to present illegal aliens to immigration officials after entry at an unauthorized location such as Matheson Hammock. Rather, the plain language of the statute requires the defendant to immediately bring and present an alien to immigration officials "at a designated port of entry." According to Special Agent Ramos's testimony, and pursuant to 8 C.F.R. § 100.4, Matheson Hammock is <u>not</u> such a port.

Moreover, the legislative history of 8 U.S.C. § 1324 indicates that subsection (a)(2) was added in 1986 to clarify that "a person who knowingly transports an undocumented alien to <u>any place in the United States</u> will be subject to criminal prosecution if that person knew the alien was undocumented or acted with wilful[ ] blindness concerning the alien's immigration status." H.R. Rep. No. 99-682(I), at 66 (1986) <u>as reprinted in</u> 1986 U.S.C.C.A.N. 5649, 5670 (emphasis added). The

21

amendments specifically targeted a situation such as the present one by "increas[ing] the penalties for . . . knowingly bringing aliens, whether documented or not and whether an entry occurs or not, to <u>any place in the United States other than designated ports of entry</u>." <u>Id.</u> (emphasis added).

Under Perez's reading of the statute, an alien smuggler could avoid prosecution so long as he did <u>not</u> enter at a port of entry and, if caught, claimed that he was on his way to a designated port. This interpretation not only leads to an absurd result, which, when interpreting statutory language, we should avoid, if possible, <u>Dewsnup v. Timm</u>, 502 U.S. 410, 427 (1992), but also is contrary to the legislative history of § 1342, including the 1986 amendments which added subsection (a)(2) and increased the penalties for an offense like the instant one. Simply put, from our reading, the presentation requirement is grounded on entry at "a designated port of entry."[7]

Upon careful review of the record on appeal and consideration of the parties' briefs, we discern no reversible error and affirm Perez's conviction and sentence.

**AFFIRMED.**

---

[7]Moreover, even if the statute contained a provision allowing for presentation of an illegal alien to immigration officials after entry at a non-designated port, <u>no</u> evidence at trial supports the notion that Perez was on his way to immigration authorities when Lt. Gonzalez observed him at Matheson Hammock. Indeed, Perez's nervous behavior and failure to inform Lt. Gonzalez of the aliens' presence, along with the unusual hour of the landing and rough weather, suggest just the <u>opposite</u> -- that Perez had no intention to present the six Cubans to immigration authorities and instead was trying to conceal the aliens from Lt. Gonzalez.