GREEN, J.
(dissenting).
When the police officers in this case parked their unmarked vehicle directly behind a lawfully parked car in a parking lot in which G.M. was seated and announced their arrival by activating their police emergency lights, G.M. was unlawfully seized for purposes of the Fourth Amendment because the officers had no reasonable suspicion that G.M. had committed any crime. By virtue of the show of police authority presented under this factual scenario, it is both patently unreasonable and potentially dangerous for any citizen to believe that he or she was immediately free to drive, run, or walk away from these police officers. For the reasons that follow, I believe that the trial court erred in its determination that this initial stop was consensual in nature. Therefore, G.M.’s motion to suppress should have been granted.
I.
To understand why the trial court erred in its denial of the motion to suppress, a full and objective recitation of all of the pertinent record evidence is first necessary.
Miami-Dade Police Officers Edward Smith and Elian Cuenca are undercover members of the crime suppression team, a protective squad unit that investigates street level narcotics activity. Prior to the incident at issue, the police had received several complaints about drug activity at the Kendall Lakes Park, a Miami-Dade County public park. As a result of these complaints on August 8, 2006, Officers Smith and Cuenca decided to patrol the park in an unmarked police vehicle. The officers were wearing plain clothes at the time.
At about five o’clock in the afternoon, which was still within normal park operat *537 ing hours, the officers’ attention was drawn to a group of people; G.M. was in the group. The police officers saw these individuals talking and getting in and out of two cars parked alongside each other in two parking stalls; one car was a black Lexus. Although the officers had not received any complaints about G.M. or the other individuals, they decided to watch the group’s activities from across the street.
For approximately fifteen minutes, the police officers basically observed G.M. get in and out of the black Lexus and walk over and talk to the others standing outside of the two parked cars in the parking lot. During this period of time, neither of the officers observed any drug activity or other criminal violations. Nevertheless, the two police officers decided to approach the individuals. The police testified that they approached the group because they were not engaged in what the officers considered “normal park activities.”[1] Instead the officers characterized the group’s behavior as “loitering.” Thereafter, the officers drove their unmarked vehicle into the park, and parked it about three feet directly behind the parked Lexus in which G.M. was seated at the time. This car was effectively blocked from the rear.[2] The officers activated their flashing emergency police lights and simultaneously exited the vehicle. They were armed with undrawn handguns and they held up the badges on lanyards around their necks.[3]
After the officers exited their vehicle, Officer Smith testified that he observed six to eight individuals standing outside of the black Lexus and G.M. sitting in the back seat of the car. None of these individuals or G.M. attempted to flee the scene. As Officer Smith walked closer to the Lexus, he observed a window down and smelled *538 marijuana emitting from the car.[4] When Officer Smith looked into the window of the car, he observed G.M. rolling a marijuana cigarette on his lap. When the officer identified himself as a police officer, G.M. placed the marijuana cigarette inside his mouth and then spit it out. G.M. was arrested and placed into custody.
Officer Cuenca testified that after he and Officer Smith exited their vehicle and started to approach the black Lexus, he detected a strong odor of marijuana emitting from the vehicle.[5] Officer Cuenca, however, did not accompany Officer Smith up to the black Lexus. Rather, he testified that for officer safety reasons and to ensure that no one fled the scene, he stayed behind to watch the others standing around the car. In fact, Officer Cuenca essentially admitted that he was prepared to give chase and apprehend anyone who attempted to flee the scene during their investigation.[6] Finally, Officer Cuenca testified that although he could see G.M. inside of the car, he didn’t know whether G.M. saw him or Officer Smith.[7]
G.M. testified that he had been sitting in the black Lexus for five to ten minutes rolling marijuana cigarettes on his lap. He stated that someone alerted him to the presence of the police officers outside the car.[8] As the officers approached the car, he stated that he placed the marijuana inside his mouth.
At the conclusion of this testimony, both the state and defense presented legal arguments to the trial court. The defense argued that the suppression motion should be granted because the police officers ini *539 tially lacked reasonable suspicion or probable cause to detain G.M. and his friends and that under the factual circumstances of this case the encounter was not consensual. The state argued that the encounter was purely consensual. The trial court agreed and denied the motion to suppress.
G.M. appeals and argues that the trial court erred in its determination that the police engaged in a consensual encounter under the facts and circumstances of this case. He argues that when, without reasonable suspicion or probable cause to believe that any criminal activity was afoot, the officers pulled up directly behind the parked car in which he was seated and flashed their emergency lights that he was unlawfully seized or detained at that precise moment for purposes of the Fourth Amendment. He further argues that the subsequent smell of the marijuana by the officers upon their exit from their vehicle cannot justify his initial unlawful detention or seizure.
Thus, the foremost issue to be resolved on this appeal is whether, under the specific facts and circumstances of this case, the police officer’s initial approach to G.M. and the other individuals in the parking lot was consensual in nature or an unlawful show of police authority not founded upon reasonable suspicion or probable cause. Put another way, the question is whether any reasonable person in G.M.’s position would have believed that he or she was free to leave the scene upon the arrival of the two police officers. Prior to today’s majority holding, this latter question would have resoundly and uniformly been answered in the negative by every other Florida District Court of Appeal in accordance with guidelines from United States and Florida Supreme Court precedent. Because I believe that all of our sister courts have correctly resolved this issue, I cannot join the majority’s opinion to the contrary in this case.
II.
According to the Fourth Amendment, “the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” U.S. Const, amend. IV. For Fourth Amendment purposes, the Florida Supreme Court has explained that there are three levels of police-citizen encounters:
The first level is considered the consensual encounter and involves only minimal police contact. During a consensual encounter a citizen may either voluntarily comply with a police officer’s requests or choose to ignore them. Because the citizen is free to leave during a consensual encounter constitutional safeguards are not invoked. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
The second level of police-citizen encounters involves an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. § 901.151, Fla. Stat. (1991). In order not to violate a citizen’s Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop.
[T]he third level of police-citizen encounter involves an arrest which must be supported by probable cause that a crime has been or is being committed. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); § 901.15, Fla. Stat. (1991).
*540 Popple v. State, 626 So.2d 185, 186 (Fla.1993) (emphasis added).
In this case, the trial court concluded that the police officer’s initial encounter with G.M. and the others was consensual in nature because there was no evidence of a police detention.[9] As a matter of law, the trial court’s conclusion was simply wrong.
In Popple, the Florida Supreme Court enunciated that there is no “litmus-paper test” for distinguishing a consensual encounter from a seizure. Popple, 626 So.2d at 187. Nevertheless, the court explained that a significant identifying characteristic of a consensual encounter is that the officer does not hinder or restrict the person’s freedom to leave or freedom to refuse to answer inquiries, and the person may not be detained without a well-founded and articulable suspicion of criminal activity. Id. at 188.
This court has consistently held that a person is seized if, under the circumstances, a reasonable person would conclude that he or she is not free to end the encounter and depart.
Id. (citing Jacobson v. State, 476 So.2d 1282 (Fla.1985)).
Following this pronouncement in Popple, and not pursuant to any application of a per se rule[10] as opined by the majority, Florida courts have (before today) uniformly and consistently held that “an officer’s use of his or her emergency lights generally evidences an investigatory stop rather than a consensual encounter.” Young v. State, 803 So.2d 880, 882 (Fla. 5th DCA 2002) (citing Siplin v. State, 795 So.2d 1010 (Fla. 2d DCA 2001); Hrezo v. State, 780 So.2d 194 (Fla. 2d DCA 2001); Brooks v. State, 745 So.2d 1113 (Fla. 1st DCA 1999)). The reason that these stops are deemed investigatory is “because the use of emergency lights reasonably leads a citizen to believe that he or she is no longer free to leave”. Id. See Koppelman v. State, 876 So.2d 618 (Fla. 4th DCA 2004); Errickson v. State, 855 So.2d 700 (Fla. 4th DCA 2003). As the Second District in Hrezo astutely put it:
When a police officer turns on his or her emergency and takedown lights under these circumstances, a reasonable person would expect to be stopped, at a minimum, for a traffic infraction and perhaps for the crime of fleeing and eluding if he or she drove away. See § 316.126, Fla. Stat. (1999) ...
780 So.2d at 196 (citation omitted). See Brooks, 745 So.2d at 1113-14 (observing that section 316.2397, Fla. Stat. (1997), allows only police vehicles to have blue flashing lights and section 316.126, Fla. Stat. (1997), requires all vehicles to pull to the closest edge of the roadway upon the approach of a vehicle displaying blue or red lights). For much of the same reasons, moreover, once a police officer positions a patrol car to obstruct the path of a stopped *541 vehicle, the encounter is elevated into an investigatory stop. Young, 803 So.2d at 882-83.
In this case, we had both such indicia of an investigatory stop. Once the two police officers pulled up directly behind the parked car in which G.M. was seated and blocked it from the rear, they announced their presence to the group by activating the flashing emergency police lights.[11] This then became, pure and simple, a non-consensual investigatory stop. Young, 803 So.2d at 882. No reasonable person under such circumstances would feel free to leave. Indeed, even G.M. and/or his friends, who presumably may have been under the influence of marijuana at the time, nevertheless understood that they were not free to leave the scene. Moreover, one of the officers in this case candidly admitted that no one was free to leave during this investigation and that he was prepared to give chase to, and apprehend, anyone who attempted to flee the scene.
In support of its argument that the police encounter in this case was consensual, the majority opinion essentially relies on the holdings in United States v. Perez, 443 F.3d 772 (11th Cir.2006), and United States v. Chrispin, 181 Fed.Appx. 935 (11th Cir.2006). Their reliance upon these cases is misplaced because unlike this case, neither of the police/citizen encounters in those cases evidenced a show of police authority. These decisions therefore are factually dissimilar from the instant case.
In Perez, the defendant and co-defendant were charged and convicted of illegally smuggling Cuban nationals into the United States. The facts of this case were that at approximately 1:00 a.m., Lieutenant Arthur Gonzalez, a uniformed Miami-Dade police officer, was patrolling Mathe-son Hammock Marina in an unmarked police cruiser. He observed a boat docking with four men on it. He testified that given the “rough” weather, he found it unusual for a boat to be docking at this late hour. Lt. Gonzalez turned off the car engine and watched as the boat docked. He testified that the men on the boat had watched him as he drove by and they appeared to be “confused” and “awkward” in their handling of the boat. Lt. Gonzalez further testified that the “clean” and “neat” appearance of the men was inconsistent with fishing.
Lt. Gonzalez approached the men after they loaded the boat onto a trailer and as they were standing next to the truck. Lt. Gonzalez, who was alone and in uniform, did not draw his gun and significantly, did not block the truck’s exit from the area with his patrol car. He briefly flashed his blue lights and left his car’s high-beams on to illuminate the scene. He approached the men and inquired whether the men were “okay” and why they were in the area so late. Co-defendant Valdez responded that they had been fishing. When Lt. Gonzalez asked the men whether they had identification, they each produced a Florida driver’s license. Lt. Gonzalez then asked who owned the truck and boat and Valdez responded that it was his and produced registration for the truck. Valdez told the officer that the boat’s registration was on the boat and asked if Lt. Gonzalez wanted to see it. At this point, Perez volunteered to retrieve the registration from the boat and invited Lt. Gonzalez to come aboard with him.
After boarding the boat with the officer, Perez began to look for the registration documents but was unable to find them on the boat. Valdez informed Perez that the *542 documents were in the cabin. At that point, Perez began to speak in a loud voice and appeared “nervous” and “jittery” as he approached and opened the cabin’s door. The officer then discovered four illegal Cuban nationals inside. The officer also learned that the other two men he observed assisting Perez and Valdez were also illegal aliens from Cuba.
Perez filed a motion to suppress on the grounds, among other things, that the initial encounter was not a valid Terry[12] stop because the officer did not have a reasonable suspicion of illegal activity. The district court denied the motion based upon its conclusion that the encounter was consensual in nature. On appeal, the Eleventh Circuit agreed. The court significantly found that although Lt. Gonzalez briefly flashed his blue lights to identify himself as a police officer in an unmarked car, at no point did the officer block Valdez’s truck or otherwise obstruct Perez, Valdez, or others’ exit from the area. More importantly, however, was the undisputed fact that Lt. Gonzalez neither asked to board the boat nor to see the interior of the cabin:
It also was undisputed that during the encounter Perez offered to get the registration from the boat, invited Lt. Gonzalez aboard the boat, and then proceeded voluntarily to open the cabin door, which led to the discovery of the Cuban nationals.
Perez, 443 F.3d at 778. Based upon the totality of these circumstances, the court correctly concluded that there was no “show of authority that communicate[d] to the individual that his liberty [was] restrained, meaning he [was] not free to leave.” Id. (citation omitted).
It is readily obvious that Perez is significantly different from this case, with the exception of the fact that the officer in Perez and the officers in this case flashed their blue lights to identify themselves as police in unmarked vehicles. The officer in Perez did not use his vehicle to obstruct the defendant’s vehicles. The officers in this case did. In Perez, there was only one police officer who initiated a dialogue with the defendants. There were two officers, one of whom proceeded to initiate a dialogue while the other admittedly stood guard to ensure, among other things, that no one left the scene. In Perez, the officer was in a lawful position to learn of the criminal activity through the expressed invitational gestures of the defendants. That did not occur in this case. In fact, the only way Perez could be similar to this case is if G.M. and/or his friends would have somehow summoned the two officers over to the cars as they smoked the marijuana. Perez, therefore, simply does not support the majority’s holding that the encounter in this case was consensual in nature.
The Chrispin decision is likewise not factually analogous to this case. In Chris-pin, Officer Lorente was patrolling in his marked police cruiser at approximately 10:30 p.m. when he observed Chrispin walking out of a dark alleyway into a poorly lit parking lot adjacent to several closed businesses. Officer Lorente was aware of the fact that there had been many “smash and grab” burglaries reported in the area where Chrispin was walking.
Officer Lorente pulled into the parking lot, stopped approximately fifteen to twenty feet from Chrispin, and activated the flashing lights on his police cruiser. The officer then exited his car and asked Chris-pin “to please come over to him.” Chris-pin complied. As in Perez, the court found *543 that “[n]either the police car nor [the] officer blocked the defendant from leaving the area.” Further, the officer never asked Chrispin for identification but did, politely and briefly, ask what Chrispin why he was in the area. Although Chrispin responded that he was coming from a nearby mall, the alleyway did not provide direct access to the mall because there were fences and other obstructions.
The officer noted that Chrispin became increasingly nervous during the questioning and placed his hands in his pockets several times. ' Officer Lorente asked Chrispin not to do this. The officer then asked Chrispin if he had any weapons or drugs and whether he could frisk Chrispin. Chrispin did not respond, rather he simply turned around and placed his hands on the officer’s cruiser. The officer felt what he believed to be a pocket knife in Chrispin’s pocket. Officer Lorente retrieved the item and discovered that it was a loaded handgun. The officer then arrested Chris-pin.
Chrispin moved to suppress the evidence on the grounds that he had been seized without reasonable suspicion. The trial court denied the motion on the grounds that Chrispin’s encounter was consensual. The court found that a reasonable person would have believed that he was free to leave during this police encounter and that a seizure did not take place. The court also concluded that Chrispin had consented to be frisked and even if he had not, the officer had articula-ble suspicion for the frisk based upon the fact that Chrispin was in a high crime area late in the evening, was seen emerging from a dark alleyway near closed businesses, and was nervous throughout the questioning.
The Eleventh Circuit affirmed the trial court’s conclusion that the encounter was consensual and not a seizure. The court noted that the following factors were germane to its determination of whether a seizure has occurred:
Whether a citizen’s path is blocked or impeded; whether identification is retained; the suspect’s age, education and intelligence; the length of the suspect’s detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.
Chrispin, 181 Fed.Appx. at 938 (citing United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir.1991)). In this case, the court further noted that all of these enumerated factors weighed in favor of the trial court’s conclusion that the encounter between Chrispin and the officer was not a seizure.
The same clearly cannot be said in the case before us. First of all, the car in which G.M. was seated was effectively blocked in from the rear by the officers’ vehicle. G.M. was, as were others in the group, a minor. In this case, unlike Chris-pin, or Perez, there were two police officers present, one of whom admittedly stood back and took a defensive stance to ensure that no one left or fled the scene during the course of their interaction with this group. Moreover, G.M. was in a public park during normal park hours and not in a high crime area after hours as was Chrispin. This case, therefore, is clearly factually distinguishable from Chrispin. All of these factors are critical indicia of the fact that this was an investigatory, and non-consensual, stop.
III.
Since this was indeed an investigatory Terry stop, the officers were required to have well-founded articulable suspicion that G.M. had committed, was committing, or was about to commit a crime. See § 901.151, Fla. Stat. (2007). The police officers in this case had no such well-founded, articulable suspicion that any *544 criminal activity was afoot when they initially approached G.M. and the group.
Although the officers testified that G.M. and the others were “loitering” in the park, the officers never testified to facts sufficient to show a reasonable suspicion for the crime of loitering. Under Florida law, G.M. and the others could only be guilty of the crime of loitering if (1) they were loitering or congregating in a) at a time, or in a manner not usual for law-abiding individuals; and (2) under circumstances that warranted a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity. § 856.021, Fla. Stat. (2007). G.M.
and the others were observed by the police engaging only in totally innocuous activities (i.e., talking, and getting in and out of two lawfully parked cars in a parking lot of a public park during normal park hours). The officers did not observe any activities by G.M. or the others that might endanger the safety of other park patrons or property in the vicinity. Although G.M. and his friends were not engaging in traditional “park activities” such as playing basketball, they were not required to do so in order to insulate themselves from an unlawful police encounter. Thus, the Florida loitering statute cannot be utilized to supply the missing reasonable suspicion needed to justify the stop in this case. See Rinehart v. State, 778 So.2d 331, 335 (Fla. 2d DCA 2000) (Alternbernd, J., concurring) (“Loitering has long been an offense that occasionally tempts good police officers to exercise power in a manner that is inconsistent with the standards of our free society”); E.C. v. State, 724 So.2d 1243, 1245 (Fla. 4th DCA 1999) (loitering statute is not directed at mere idling); see T.L.F. v. State, 536 So.2d 371 (Fla. 2d DCA 1988)(no probable cause to arrest appellant for loitering and prowling where officers observed shirtless appellant conversing with two other individuals during business hours, where appellant made no attempt to flee, and where shirtless attire was not unusual or unlawful).
IV.
In conclusion, the stop in this case simply cannot be deemed consensual because of the show of authority utilized by the police officers in this case. Moreover, the police officers had no reasonable suspicion or probable cause to believe that G.M. was engaging in any criminal activity when they initially pulled up behind the vehicle in which he was found seated and activated their emergency lights. Contrary to the majority’s holding, G.M. was therefore unlawfully detained at that point for Fourth Amendment purposes and his motion to suppress should have been granted. I do agree, however, with the majority that its holding is in direct conflict with Young v. State, 803 So.2d 880 (Fla. 5th DCA 2002); Hrezo v. State, 780 So.2d 194 (Fla. 2d DCA 2001); Siplin v. State, 795 So.2d 1010 (Fla. 2d DCA 2001); Brooks v. State, 745 So.2d 1113 (Fla. 1st DCA 1999); Koppelman v. State, 876 So.2d 618 (Fla. 4th DCA 2004); and Errickson v. State, 855 So.2d 700 (Fla. 4th DCA 2003), and, accordingly, conflict certification to the Florida Supreme Court is appropriate.

.Officer Smith testified that:
Yes, we observed several juveniles or people, there were some adults, loitering in the park. They were next to a black Lexus, with also another vehicle next to it. We observed them for like 15 minutes. I observed the defendant in the black Lexus, which actually, he got out of the vehicle a couple of times, went over talking to the group of kids that were next to him. So they were all there together. We waited, like I said 15 minutes to see [sic] maybe they were going to play basketball, or what have you and nobody did anything to actually do that. And basically, we approached. Similarly, Officer Cuenca testified as follows:
Q. I'm saying, when you were across the street with Officer-with your partner in the vehicle, at that point have you seen anybody making drug transactions?
A. We didn’t see the transaction, but there was another car there full of other juveniles and since he [G.M.] was coming in and out, there was other juveniles coming in and out of the cars, they looked very suspicious. They weren't playing basketball. There weren't doing anything that has to do with the park. So that’s when we approached them.

. Officer Smith’s testimony:
Q. You also testified that when you approached, you approached initially in your vehicle, not on foot. Correct?
A. Right, we drove up behind them.
Officer Cuenca’s testimony:
Q. Okay. Now when you approached the children, you did so in your unmarked police vehicle is that correct?
A. Correct.
Q. And you approached then; you pulled up behind their parked car?
A. Correct.
Although there was no direct testimony that the officers’ vehicle blocked G.M.’s vehicle from the rear, this is the only reasonable and logical inference to be drawn from the officers’ testimony. Since the record is silent as to whether this particular parking lot had the typical frontal concrete parking barriers, it is unknown whether this car was blocked in from the front as well.

. The record doesn’t reflect whether the officers were wearing any other police insignia on their shirts or pants.

. Q. Okay, and so as you're approaching the respondent or this group of people, what do you observe?
A. I just observed them, a few of them were out of the car, there was like between six and eight of them. I don't know the exact amount, and that's when I observed, when I got closer to the vehicle, I observed the window down of the vehicle and marijuana emitting from the vehicle.

. Q. Okay, Now you have stated earlier in your testimony that after you exited the vehicle and you approached that once you got closed, you smelled the odor of marijuana.
A. Yes.
Q. Suspect marijuana?
A. Yes.

. Q. Now, when you exited the vehicle, did you announce to them that you were police officers, even though you have your badge on?
A. I don't know if my partner did. I didn't.
Q. You did not. Okay. Did anyone try and run away when you approached?
A. No.
Q. Were you concerned that someone might try and run away?
A. Yes.
[[Image here]]
Q. And when you approached, although you had not observed an actual crime being committed, you approached to investigate the situation. If someone upon your approach had taken off you would have attempted to apprehend them to continue the investigation is that correct?
A. Correct.
[[Image here]]
Q. And when you approached, although you had not observed an actual crime being committed, you approached to investigate the situation. If someone upon your approach had taken off, you would have attempted to apprehend them to continue the investigation, is that correct?
A. Correct.

. Q. And did the defendant see you?
A. I’m not sure if he saw us. I’m not sure if he saw me.

. Q. How did you know the Officers were outside the car?
A. Someone told me.
Q. Was there someone in the car?
A. Yes.
Q. What did you do when the officers approached the car?
[[Image here]]
A. I had marijuana in my lap and I was rolling. I put it in my mouth.

. According to the trial court:
There was no evidence counsel, no evidence that these folks were detained in this classic sense of a detention. Circumstances weren’t there. The police weren’t there in (unintelligible). They didn’t pull out their guns. They hadn’t surrounded anybody. As a matter of fact, the Respondent in this case was sitting in a car. Never even opened the door, according to the testimony. So, you know, he was there. He wasn’t going anywhere anyway because he was sitting in the car. Based on the totality of these circumstances, the Court is going to deny the motion to suppress. Denied.

. See, e.g., Hrezo v. State, 780 So.2d 194, 195 (Fla. 2d DCA 2001)(taking care to note that it was not deciding whether a consensual encounter occurred when an officer turned emergency lights on for a second or two at night to signal to a citizen that the approaching person is a police officer rather than a robber).

. G.M. testified that he was made aware of the presence of the police by another passenger in the car. The officers did not (and indeed could not) dispute such testimony.

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).