[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————————

No. 19-10083

————————————————————

D.C. Docket No. 8:18-cr-00100-VMC-AAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY W. KNIGHTS,

Defendant-Appellant.

————————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————————

(August 3, 2020)

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, Circuit Judge, and
MOORE,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

_____

[*] Honorable K. Michael Moore, Chief United States District Judge for the Southern
District of Florida, sitting by designation.

This appeal requires us to decide whether officers violated Anthony Knights's right to be free from unreasonable seizures, under the Fourth Amendment, by conducting an investigatory stop without reasonable suspicion. Two officers saw Knights and Hozell Keaton around 1:00 a.m. in a car that was parked in the front yard of a home. Suspecting that the men might be trying to steal the car, the officers parked near it and approached Knights, who was in the driver's seat. When Knights opened the door, an officer immediately smelled marijuana. The ensuing search of Knights and the car revealed ammunition and firearms. Because Knights had felony convictions, a grand jury charged him with possession of a firearm and ammunition by a felon, 18 U.S.C. §§ 922(g)(1), 924(a)(2). Knights moved to suppress the evidence the officers found and the statements he made as fruit of an unlawful seizure. The district court denied the motion, convicted Knights, and sentenced him to 33 months of imprisonment. We affirm because Knights's interaction with the officers was a consensual encounter that did not implicate the Fourth Amendment.

## I. BACKGROUND

Late at night, Anthony Knights, Hozell Keaton, and Knights's nephew were smoking marijuana and listening to music while sitting in or standing near an Oldsmobile sedan in Tampa, Florida. The car was parked in a grassy area between the street and the white fence of a home that belonged to one of Keaton's relatives.

2

The driver's side of the car was near the street and the passenger's side was near the fence.

On a routine patrol around 1:00 a.m., Officers Andrew Seligman and Brian Samuel of the Tampa Police Department saw two of the car's doors open with Knights and Keaton leaning into the car. The officers believed that Knights and Keaton might be stealing something from the car. They knew the area to be "high crime" and to have gang activity from their experience responding to multiple shootings and narcotics crimes. So they drove past the Oldsmobile for a better look. Knights and Keaton then "gave the officers a blank stare," and according to Officer Seligman, "kind of seemed nervous." The officers then heard someone unsuccessfully try to start the car. Thinking that Knights and Keaton "might be actually trying to steal the vehicle," the officers decided to investigate further.

Officer Seligman decided to turn around and park the patrol car near the Oldsmobile, which was parked on a grassy area next to the street in the direction of traffic for that side of the road. Officer Seligman parked on the street next to the Oldsmobile in the wrong direction for traffic so that the trunk of the patrol car was nearly aligned with the trunk of the Oldsmobile. As Officer Seligman was parking, he trained his flashlight on Knights. According to Knights and Officer Seligman, the patrol car was parked in a way that would have allowed Knights to drive away.

3

Officer Samuel left the patrol car and attempted to talk to Keaton, who was walking toward the house, but Keaton entered the house without responding.

The officers then approached Knights, who sat in the driver's seat and closed the car door. Officer Seligman approached the car with his flashlight and knocked on the driver's window. When Knights opened the door, Officer Seligman "was overwhelmed with an odor of burnt marijuana." Officer Seligman asked Knights if he owned the car, and Knights said that he and his wife owned it and gave Officer Seligman his driver's license and possibly the registration for the car. The officers later confirmed that his wife owned the car. When Officer Seligman asked Knights if he had marijuana, Knights said, "I'll be honest with you. It's all gone."

Officer Seligman then began to search for narcotics. He searched Knights's person and found a pill bottle containing several different kinds of pills. Officer Seligman arrested Knights and searched his car, starting with a backpack that Knights said contained a prescription for the pills. He found medical documents, a firearm cartridge, and a ski mask. He also found a scale, smoked marijuana, marijuana residue, a handgun, a rifle, and another firearm cartridge. Knights agreed to an interview after the officers warned him of his rights, *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966), and he then admitted that he owned the handgun. Knights and the officers described the entire encounter as calm and amicable.

4

A grand jury indicted Knights on one count of possessing a firearm and ammunition as a felon, 18 U.S.C. §§ 922(g)(1), 924(a)(2). Before trial, Knights moved to suppress his admissions and the evidence the officers found during the search. He argued that they were fruit of an illegal seizure that occurred when—without reasonable suspicion—the officers parked behind his car or, at the latest, when they walked up to his car. The government responded that the incident "began as a police-citizen encounter" and did not turn into a "seizure" until the officers started searching for narcotics based on probable cause that Knights possessed marijuana, and alternatively, the officers had reasonable suspicion to conduct an investigatory stop.

The district court referred the motion to a magistrate judge who held a hearing and recommended granting the suppression motion. The magistrate judge recommended ruling that the officers conducted an investigatory stop because "the officers' show of authority, especially Officer Seligman, their locations as they approached the car, and the patrol car impeding Mr. Knights's ability to drive away, [established that] no reasonable person in Mr. Knights's position would feel free to leave or disregard the two officers." And because the magistrate judge determined that the officers lacked reasonable suspicion and the physical evidence and statements were fruit of the unlawful seizure, she recommended granting the motion.

5

The district court, after considering briefing and oral argument, accepted the magistrate judge's recitation of the facts but disagreed with her recommendation and denied the suppression motion. It explained that the constitutionality of the officers' conduct turned on *when* they seized Knights because the odor of marijuana provided a lawful basis for seizing him. It ruled that the officers did not seize him when they parked their patrol car and walked up to Knights because "it was a police-citizen encounter involving no detention and no coercion." The district court found that Knights could have either driven away "with skilled driving" or walked away. It also relied on the absence of the police questioning Knights, displaying their weapons, touching him, asking for his identification, or having a verbal exchange with him.

Knights proceeded to a bench trial at which he and the government stipulated to the relevant facts. The district court adjudicated him guilty and sentenced him to a below-guideline sentence of 33 months of imprisonment.

## II. STANDARDS OF REVIEW

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." *United States v. Perez*, 443 F.3d 772, 774 (11th Cir. 2006) (internal quotation marks omitted). We review its legal conclusions *de novo*, and we accept its factual findings unless they are clearly erroneous. *Id.* We construe the

6

facts in the light most favorable to the government because it prevailed in the district court. *Id.*

### III. DISCUSSION

The Fourth Amendment protects "[t]he right of the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A "seizure" does not occur every time a police officer interacts with a citizen. Officers are free to "approach[] individuals on the street or in other public places and put[] questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). In these consensual encounters, the officers need no suspicion because the Fourth Amendment is not implicated. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Perez*, 443 F.3d at 777–78. But officers need reasonable suspicion if an encounter becomes an investigatory stop. *See Bostick*, 501 U.S. at 434; *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). An investigatory stop occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Jordan*, 635 F.3d at 1185 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

The test for whether the officer restrained a citizen's liberty is whether "a reasonable person would feel free to terminate the encounter." *Drayton*, 536 U.S. at 201; *see also Immigr. & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215 (1984). We must imagine how an objective, reasonable, and innocent person would

7

feel, not how the particular suspect felt. *Drayton*, 536 U.S. at 202; *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988). All the circumstances are relevant, *Bostick*, 501 U.S. at 439, including "whether a citizen's path is blocked or impeded"; whether the officers retained the individual's identification; "the suspect's age, education and intelligence; the length of the . . . detention and questioning; the number of police officers present"; whether the officers displayed their weapons; "any physical touching of the suspect[;] and the language and tone of voice of the police." *Perez*, 443 F.3d at 778 (internal quotation marks omitted); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.).

Knights argues that the district court should have suppressed his admissions and evidence because the officers stopped him without reasonable suspicion when they parked the patrol car close to his car and then approached him. He does not challenge any seizure that occurred after that point. The government responds that the encounter between Knights and the officers was initially consensual and alternatively that the officers had reasonable suspicion. Because we conclude that the encounter was initially consensual, we need not decide whether the officers had reasonable suspicion.

In this encounter, a reasonable person would have felt free to leave. In fact, Knights's companion Keaton did leave. As Keaton had done, Knights was physically capable of walking away. He also could have driven away, and the

8

officers did not display their weapons, touch Knights, or even speak to him—let alone issue any commands or ask him for his identification and retain it. And before the officers approached Knights, they did not activate the lightbar or siren on the patrol car, and as we have mentioned, they allowed Keaton to leave the car, ignore their invitation to talk, and enter the home where the car was parked.

In similar circumstances, we have concluded that an officer did not restrain a suspect. In *Miller v. Harget*, an officer parked behind a suspect's parked car—blocking him from driving away—and then "turned on his 'window lights'" and approached the suspect's car on foot. 458 F.3d 1251, 1257–58 (11th Cir. 2006). We reasoned that when the officer quickly approached the suspect's car, he "did not do anything that would appear coercive to a reasonable person. For example, he did not draw his gun, give any directions to [the suspect], or activate his roof lights." *Id.* at 1257. Because the officer did not make a "show of authority that communicated to the individual that his liberty was restrained," it was not an investigatory stop. *Id.* at 1258 (alterations adopted) (internal quotation marks omitted). For the same reason, a reasonable person in Knights's position would have felt free to leave; the officers did not make a show of authority communicating that Knights was not free to leave.

Knights disagrees and relies on our precedent *United States v. Beck*, in which we concluded that the officers stopped the defendant because of the

9

proximity between his car and the officers' car. 602 F.2d 726, 727, 729 (5th Cir. 1979). Two officers pulled their patrol car alongside Beck and his passenger's parked and idling car and "engaged [them] in conversation" about what they were doing there. *Id.* at 727. We explained that "[b]y pulling so close to the [car], the officers effectively restrained the movement of Beck and his passenger" and it was clear "that they were not free to ignore the officers and proceed on their way." *Id.* at 729 (alterations adopted) (internal quotation marks omitted). Knights argues that the same is true here because the way in which the officers parked blocked him from driving away, and the officers also impeded his ability to walk away.

We are unpersuaded that *Beck* controls here. The officers approached Knights in a meaningfully different manner. Instead of parking alongside his car and engaging him in conversation, they parked near his car—with enough space for him to drive away—and approached his car to try to speak to him, without conveying that Knights was required to comply. Indeed, as we have noted, just a moment earlier, Knights's companion obviously felt free to leave the car, ignore the officer's invitation to speak with him, and enter the house.

Knights's other arguments are also unpersuasive. He argues that a reasonable person would not have felt free to walk away because doing so would have required abandoning his car in a high-crime area. But we disagree because two officers would have been near the car, and Knights could have easily returned

10

to the car as soon as they left. He also repeatedly mentions that Officer Seligman used a flashlight when he approached the Oldsmobile. But we fail to see how a flashlight communicated a show of authority in these circumstances. A flashlight would also be used by "an officer approach[ing] a stranded motorist to offer assistance," *Miller*, 458 F.3d at 1258, or by an ordinary person outside in the middle of the night. Knights also argues that the presence of *two* officers weighs in favor of the encounter being a seizure, and that "young African-American men feel that they cannot walk away from police without risking arrest or bodily harm." Although the presence of multiple officers and the age and race of a suspect may be relevant factors, *see Mendenhall*, 446 U.S. at 558; *Perez*, 443 F.3d at 778, the totality of the circumstances establish that this encounter was not coercive.

## IV. CONCLUSION

We **AFFIRM** Knights's conviction.

11